

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00348-CR

———————————————————

JASINTO JIMENEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. DC30-CR2022-0995

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A jury found appellant Jasinto Jimenez guilty of the felony murder of Andres Diaz as alleged in the indictment and assessed his punishment at forty-five years' imprisonment. *See* Tex. Penal Code Ann. § 19.02(b)(3); *see also Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014). The trial court sentenced him in accordance with the jury verdict. Jimenez appealed.

On appeal, Jimenez raises two issues. First, he argues that the evidence is insufficient to show that the delivery of fentanyl is objectively an act clearly dangerous to human life. Second, he contends that the evidence is insufficient to show that he caused Diaz's death. Because the evidence is sufficient to show that Jimenez committed an act clearly dangerous to human life and to show that Jimenez caused Diaz's death, we overrule both of Jimenez's issues and affirm the trial court's judgment.

## II. BACKGROUND

The State's case focused on (A) a June 2022 incident involving Jimenez's possession of fentanyl, (B) a July 2022 incident concerning Jimenez's sale of the fentanyl that killed Diaz, and (C) the testimony of an emergency-medicine physician and medical toxicologist regarding the lethality of fentanyl.

## A. June 2022 Incident

In late June 2022, Robert Jones, a Wichita Falls police officer, executed a warrant on Jimenez's home. When executing the warrant, Officer Jones found a suspected fentanyl pill. The pill was blue with an "M" on one side and a "30" on the other. Having previously seen similar pills, Officer Jones immediately recognized it and stated that its street name was "perc," which was short for Percocet, and that it typically contained fentanyl. Officer Jones explained that Percocet and fentanyl were not the same thing, but in the drug world, if someone asked for a "perc," the person was asking for something with fentanyl in it.

After arresting Jimenez, Officer Jones informed him of his rights, and Jimenez agreed to an interview that Officer Jones recorded. During the interview, Jimenez admitted that the pill was his. Jimenez further acknowledged that the pill was a "street pill" and that some street pills contained fentanyl.

Jimenez said that he had been using "percs" for about two months[1] and had been trying to get off of them, but the withdrawals, which could last a week, were very bad, so getting off of them was difficult. He explained that he was waking up every morning in pain.[2] Jimenez said that the pills had "f[**]ked [him] up."

---

[1]Jimenez later qualified the length of time that he had been taking "percs." He said that he had taken them about a year earlier, had stopped taking them, and then had resumed about two months before his arrest.

[2]Later in the interview, one of the officers asserted that he was aware that the withdrawals were "terrible"—stomach aches, sweats, and chills.

Jimenez asserted that he took two to ten pills a day but acknowledged that he had to slow down because taking the pills was hurting his body. Jimenez maintained that he smoked his pills using foil and a straw. Jimenez denied selling the pills and stated that he was aware that they were dangerous and had killed at least one other person. At one point during the interview, one of the officers commented that there were "a lot of kids overdosing and dying on these things," and Jimenez nodded his head in agreement.

Jimenez said he paid $10 per pill, to which one of the officers responded that the price "was a pretty good deal." An officer later confronted Jimenez and asserted that he knew that the pills sold for more than $10 apiece.[3]

When asked what he did for a living, Jimenez first said that he worked for a legitimate company that paid cash but then acknowledged that he had not worked in about six weeks. When asked how he was paying for his pills, Jimenez said that he had been borrowing money and that sometimes people "fronted" him pills. After one of the officers asked if Jimenez was selling pills to fund his own habit, Jimenez acknowledged that he would purchase up to ten pills at a time, which he later modified to fifteen, and that he sold them to his friends "now and then."

Regarding the blue pill that Officer Jones found and that Jimenez admitted was his, a laboratory test later confirmed that it contained fentanyl.

---

[3]Jimenez charged $30 for the pill that killed Diaz.

## B. July 2022 Incident

A little over two weeks later, in July 2022, Jimenez sold "[t]wo percs and two Gs of marijuana" to Leigha Smith, who purchased the drugs for herself and Diaz.[4] Smith explained that she and Diaz "g[o]t high together" and that getting high together was "just what [they] did." Smith negotiated the exchange with Jimenez in his driveway while Diaz remained in the car parked at the curb. Smith described the "percs" as blue pills with an "M" on them. Although unsure, Smith thought that a Percocet was oxycodone and acknowledged having orally taken "percs" twice before. Smith said that the "two Gs" of marijuana correlated to two "blunts"—"weed in a cigarillo."

After the purchase, Smith and Diaz drove to Diaz's home, and Smith took her "perc" orally with some Gatorade while Diaz crushed and "snorted"—inhaled—his. Both smoked the marijuana. According to Smith, the only drugs that Diaz took were those that she had purchased from Jimenez.

Smith related that they then went driving around Wichita Falls, and about thirty minutes later, Diaz fell asleep and started snoring. Eventually Smith drove to her grandmother's home. After unsuccessfully trying to wake Diaz, Smith left him in the

---

[4]At trial, a recording of a call between Jimenez and a woman was played for the jury. In the call, Jimenez told the woman that he had been charged with murder, and the woman responded that she had just seen the "girl" who "sold" the drugs to Diaz get "locked up for that." When the woman asked Jimenez if he gave the pills to Diaz, Jimenez asserted that he had given the pills to the "girl."

car while she went inside her grandmother's house to watch a movie. About thirty minutes later,[5] when Smith went back to the car to check on Diaz, she discovered that he was no longer snoring.

Concerned because Diaz was no longer snoring, Smith grabbed her mother, who checked on Diaz. Smith's mother, after determining that Diaz felt cold to the touch, used a stethoscope to check for a heartbeat but found none. Smith then rushed Diaz to a hospital. According to Smith, although hospital personnel started CPR, Diaz "didn't make it."[6]

Because the hospital had a deceased person in the emergency room, the police were called. Officer Iman Nematollahi responded to the call; he explained that it was routine for an officer to get a call when someone died in the emergency room. He commented, "I've worked on multiple . . . cases for drug-related [deaths]." Officer Nematollahi spoke briefly with Smith, who identified Diaz. The officer then turned the case over to Detective Allen Killingsworth, who had been assigned the case.

Alerted to a death from a possible overdose, Detective Killingsworth reported to the hospital and spoke with Smith. When Smith told Detective Killingsworth that she had purchased "percs," he found the information to be significant because, as he

---

[5]A detective to whom Smith spoke said that Smith had told him that she had watched the whole movie.

[6]At the time of trial, Smith was facing a manslaughter charge for Diaz's death and had been in custody for "about a year."

explained at trial, there was a "pretty apparent problem" with fentanyl overdoses coming from counterfeit Percocet pills.

The medical examiner, Dr. Emily Odgen, performed an autopsy on Diaz and testified that he had died from a fentanyl overdose. Dr. Odgen added, "[H]e was basically a normal [twenty-one]-year-old; no other good reason that he would have been dead."

## C. Emergency-Medicine Physician and Medical Toxicologist Testimony

An emergency-medicine physician and a medical toxicologist, Dr. Stacy Hail, testified that the United States had a fentanyl epidemic and that she "spen[t] a lot of time either treating fentanyl overdoses in a health care setting or having to look at a lot of dead bodies in the legal cases that [she] review[ed]." While Dr. Hail primarily treated fentanyl overdoses in the Dallas/Fort Worth Metroplex, she had testified about cases not only in the Metroplex but "all over the country, from Florida to New York" and would, shortly after Jimenez's trial, testify in Hawaii because "fentanyl is everywhere."

Dr. Hail asserted that fentanyl had legitimate purposes such as treating chronic pain in cancer patients or treating a patient in the emergency room who was having a fracture reduced. When fentanyl is administered properly, the patient receives only micrograms—which is one-thousandth of a milligram, which itself is one-thousandth of a gram—of the substance.

Dr. Hail stated that pharmaceutical fentanyl is processed in a much more controlled manner than illicit fentanyl. Drug dealers—unlike pharmaceutical companies—do not have good quality-control programs. Consequently, persons taking a "fake" pill never know how much fentanyl they are ingesting.

According to Dr. Hail, fentanyl is a fully synthetic opioid, and morphine is the baseline for measuring the potency of opioids. Codeine is one-tenth the potency of morphine; oxycodone is 1.5 to 3.5 times more powerful than morphine; heroin is 2.5 to 5 times more powerful than morphine; and fentanyl is 100 to 150 times more powerful than morphine. Dr. Hail further testified that the greater the potency, the greater the lethality, and fentanyl's exceptional potency thus makes it more lethal. Dr. Hail summarized, "The dose makes the poison." Even "one tiny little fraction" of fentanyl in a pill could kill someone. When discussing fentanyl's lethality, Dr. Hail compared fentanyl to a shotgun and oxycodone to a BB gun.

The range of the potency depends on how the drug was ingested—by mouth, by crushing and "snorting" (inhaling) it, or by melting and injecting it. Swallowing a fentanyl pill is less lethal because "a huge chunk of the fentanyl gets inactivated by [the] liver."[7] In contrast, "snorting, chasing the dragon,[8] [or] shooting up," that is,

_____

[7]Smith, who took her pill orally, said that she did not feel anything.

[8]Dr. Hail described "chasing the dragon":

Chasing the dragon is when you get a piece of foil[,] and you put a little bit of the crushed[-]up pill on it[;] you get a lighter[,] and you burn it

8

inhaling, smoking, or injecting the drug into a vein—"takes the liver out of the equation" and the fentanyl goes straight into the blood system. Fentanyl can be absorbed through the skin using pharmaceutical-grade patches, but just touching the fentanyl powder will not have an effect. Through repeated use, a person could build up a tolerance to fentanyl.[9]

According to Dr. Hail, a person suffering from a fentanyl overdose will show three signs.[10] First, the person's pupils will become pinpoints. Second, the person will become sleepy, unconscious, or comatose. And third, the person's breathing will become slower and slower and may stop entirely. If a person dies from a fentanyl overdose, the person will often have pulmonary edema—like other persons who die

---

underneath the foil[ but] not so close that you'll burn it[] because once you burn it, then it's done. And it creates a steam that comes off that foil. And you take a straw or a hollowed[-]out pen tube or some people even roll up a dollar bill, and you chase the dragon, or you chase the steam, and you inhale that steam to get your high.

During Jimenez's interview, he described smoking the pills using tin foil and a straw.

[9]During his interview, Jimenez asserted that he smoked up to ten pills a day. He also stated that when he smoked the pills, he felt that he no longer got high and that he smoked just to feel normal.

[10]Dr. Hail referred to the signs as toxidromes, which are symptoms unique to a substance. She explained, "[A]s a medical toxicologist, we understand that dying from one substance looks completely different from dying from another substance."

from opiate overdoses—because the body is not able to protect its airways. Pulmonary edema is a build-up of fluid in the lungs.[11]

Dr. Hail explained that China produces illicit fentanyl and sends it to Mexico, and from Mexico, the illicit fentanyl finds its way into the United States in the form of counterfeit pills that look like Percocet. Percocet consists of just oxycodone[12] or oxycodone mixed with acetaminophen and is sold as a blue pill stamped with an M30 on it. Consequently, the counterfeit pills are called "blues or fake [o]xys." Unlike pharmaceutical-grade pills, however, the counterfeit pills might be 100 percent fentanyl, fentanyl mixed with Xanax, or "just about any kind of substance"; more recently, however, they seemed to be 100 percent fentanyl. Put differently, the counterfeit pills might have a thousand times more fentanyl than would ever be used in a healthcare setting. Consequently, "one tiny little fraction" of a counterfeit pill might be lethal. According to Dr. Hail, "[M]ost of the people that are dying from fentanyl are using . . . a little tiny fraction of one pill."

## III. DISCUSSION

Jimenez challenges the sufficiency of the evidence (1) to show that the delivery of fentanyl is objectively an act clearly dangerous to human life and (2) to show that he caused Diaz's death.

---

[11]Dr. Ogden testified that Diaz had pulmonary edema.

[12]Oxycodone is a drug listed under Penalty Group 1. Tex. Health & Safety Code Ann. § 481.102(3)(A).

10

## A. Standard of Review

In our evidentiary-sufficiency challenge review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

11

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021).

## B. Applicable Law

In the indictment, the State alleged that in 2022, Jimenez had committed a felony by knowingly delivering fentanyl, a controlled substance under Penalty Group

12

1-B, in an amount of less than one gram. Standing alone, the delivery of less than one gram of fentanyl was, at that time, a state-jail felony. Act of May 26, 2021, 87th Leg., R.S., ch. 584, S.B. 768, §§ 3, 5 (amended 2023) (current version at Tex. Health & Safety Code Ann. §§ 481.1022, .1123(a), (b)).[13] But the State further alleged that in the course of committing or attempting to commit that felony, Jimenez committed or attempted to commit an act clearly dangerous to human life—selling, delivering, or dealing "fentanyl and/or [P]ercocet and/or another illegal narcotic in Penalty Group 1" that contained fentanyl—that caused Diaz's death. *See* Tex. Penal Code Ann. § 19.02(b)(3). This additional allegation changed the offense from delivery of a controlled substance to felony murder and the degree of the offense from a state-jail to a first-degree felony.[14] *See id.* § 19.02(c); *Nguyen v. State*, 693 S.W.3d 732, 736 (Tex.

---

[13]Effective September 1, 2023, the offense became a third-degree felony. Act of May 19, 2023, 88th Leg., R.S., ch. 910, H.B. 6, §§ 3, 6, 25 (codified at Tex. Health & Safety Code Ann. § 481.1022, .1123(a), (b)). This provision is prospective. *Id.* § 23. Jimenez's offense predates this amendment to Sections 481.1022 and 481.1123(a), (b).

[14]Effective September 1, 2023, Section 19.02 of the Texas Penal Code added a provision specifically for the manufacture or delivery of certain drugs the use of which results in death:

(b) A person commits [murder] if the person:

. . .

(4) knowingly manufactures or delivers a controlled substance included in Penalty Group 1–B under Section 481.1022, Health and Safety Code, in violation of Section 481.1123, Health and Safety Code, and an individual dies as a result of injecting, ingesting, inhaling, or introducing into the individual's body any amount of the

App.—Houston [14th Dist.] 2024, no pet.) (referring to the offense as "felony murder"); *Matthew v. State*, No. 02-22-00140-CR, 2023 WL 2607750, at *1 (Tex. App.—Fort Worth Mar. 23, 2023, pet. ref'd) (mem. op., not designated for publication) (same).

Felony murder has two essential elements: (1) the defendant committed or attempted to commit a felony, other than manslaughter; and (2) in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the defendant committed or attempted to commit an act clearly dangerous to human life that caused the death of an individual. Tex. Penal Code Ann. § 19.02(b)(3); *Nguyen*, 693 S.W.3d at 736–37.

When determining whether an act is clearly dangerous to human life, we use an objective standard. *Lugo-Lugo v. State*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983); *Durham v. State*, No. 13-19-00017-CR, 2020 WL 6343338, at *10 (Tex. App.—Corpus Christi–Edinburg Oct. 29, 2020, pet. ref'd) (mem. op., not designated for publication). "To be clearly dangerous to human life, the act need only threaten or risk a resulting death." *Durham*, 2020 WL 6343338, at *10; *see Robledo v. State*, No. 07-23-00291-CR,

---

controlled substance manufactured or delivered by the actor, regardless of whether the controlled substance was used by itself or with another substance, including a drug, adulterant, or dilutant.

Act of May 16, 2023, 88th Leg., R.S., ch. 910, H.B. 6, §§ 20, 25, (codified at Tex. Penal Code Ann. § 19.02(b)(4)). This provision is prospective. *Id.* § 23. Jimenez's offense predates this amendment to Section 19.02.

2024 WL 3220746, at \*1–4 (Tex. App.—Amarillo June 28, 2024, no pet.) (mem. op., not designated for publication) (holding that pulling victim by his ankles out of SUV and causing victim's head to hit the ground and then punching, beating, stomping, and kicking victim until victim was "out" was sufficient evidence showing that defendant had committed acts clearly dangerous to human life that caused victim's death); *Covington v. State*, No. 08-23-00176-CR, 2024 WL 1599211, at \*8 (Tex. App.— El Paso Apr. 12, 2024, pet. ref'd) (mem. op., not designated for publication) (holding that discharging a firearm in a crowd of people was sufficient evidence to show that defendant committed an act clearly dangerous to human life that caused victim's death); *Mireles v. State*, No. 08-19-00221-CR, 2022 WL 3572859, at \*3 (Tex. App.—El Paso Aug. 19, 2022, pet. ref'd) (not designated for publication) (holding that alleging that defendant's operating a vehicle in which deceased was occupant and causing the vehicle to crash was sufficient notice that defendant had committed an act clearly dangerous to human life); *Soto v. State*, No. 04-17-00491-CR, 2018 WL 2323637, at \*3 (Tex. App.—San Antonio May 23, 2018, no pet.) (mem. op., not designated for publication) ("Possession of a controlled substance, together with placing a child in a circumstance where he can ingest that controlled substance, is conduct sufficient to prove acts clearly dangerous to human life."); *Esquivel v. State*, No. 01-16-00301-CR, 2017 WL 3910793, at \*5 (Tex. App.—Houston [1st Dist.] Sept. 7, 2017, pet. ref'd) (mem. op., not designated for publication) ("Pointing a gun at another person, viewed under an objective standard, can be an act clearly dangerous to human life that could

15

cause someone's death.");[15] *Stanley v. State*, 470 S.W.3d 664, 672 (Tex. App.—Dallas 2015, no pet.) ("[A] reasonable jury could have determined that even traveling at 38 to 40 miles per hour after dark through the scene of an accident where emergency personnel were present, police lights were flashing, and traffic was being diverted was an act clearly dangerous to human life."); *Schmidt v. State*, No. 09-09-00149-CR, 2010 WL 4354027, at *6 (Tex. App.—Beaumont Nov. 3, 2010, no pet.) (mem. op., not designated for publication) ("Th[e] evidence is sufficient for a rational jury to find that [the appellant's] failure to yield the right of way to the motorcycle was an act clearly dangerous to human life."); *Nevarez v. State*, 847 S.W.2d 637, 642 (Tex. App.—El Paso 1993, pet. ref'd) (holding that "operat[ing] a motor vehicle with knowledge that the victim was clinging to the passenger side door of the vehicle [was] an act [that] a jury could [have] reasonably and objectively conclude[d] was clearly dangerous to human life").

On the clearly-dangerous-to-human-life element, felony murder dispenses with a culpable mental state. *Lomax v. State*, 233 S.W.3d 302, 305 (Tex. Crim. App. 2007). "[T]he very essence of [felony murder] is to make a person guilty of an 'unintentional' murder when he causes another person's death during the commission of some type of a felony." *Id.*

---

[15]In a published opinion, the court of appeals denied a motion for en banc reconsideration. *Esquivel v. State*, 546 S.W.3d 342 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). Two published concurring opinions accompanied the denial. *Id.* at 343 (Lloyd, J., concurring), 344 (Jennings, J., concurring).

Causation's scope under the Texas Penal Code is broad; causation exists where "the result would not have occurred but for [the] conduct, operating either alone or concurrently with another cause." *Cyr v. State*, 665 S.W.3d 551, 557 (Tex. Crim. App. 2022) (quoting Tex. Penal Code Ann. § 6.04(a)). A criminal defendant remains liable if his conduct is sufficient to have either caused the result alone or together with a concurrent cause. *Id.* The result must also have been foreseeable. *See* Tex. Penal Code Ann. § 6.04(a); *Cyr*, 665 S.W.3d at 557, 560; *Williams v. State*, 235 S.W.3d 742, 764 (Tex. Crim. App. 2007).

## C. Application

Jimenez does not contest the first element of felony murder—that he committed the state-jail felony of delivery of less than one ounce of fentanyl; rather, he contests only the second element—whether, in the course of committing a felony, he committed an act clearly dangerous to human life that caused Diaz's death.

### 1. The delivery of fentanyl is clearly dangerous to human life.

The evidence showed that fentanyl was deadly and that its lethality was foreseeable:

- When Jimenez was arrested and gave an interview in June 2022, he stated that he was aware that "percs" contained fentanyl, fentanyl could kill, and fentanyl had killed.

- Jimenez agreed when the officer interviewing him asserted that fentanyl was killing people.

17

- Dr. Hail explained that fentanyl, when compared to other commonly abused drugs, was exponentially more dangerous and deadly. Oxycodone is 1.5 to 3.5 times more powerful than morphine; heroin is 2.5 to 5 times more powerful than morphine; but fentanyl, in contrast, is 100 to 150 times more powerful than morphine. Dr. Hail testified that fentanyl's exceptional potency made it more lethal and that "one tiny little fraction" of fentanyl in a pill could kill someone.

- Dr. Hail described fentanyl as a nationwide epidemic.

- Dr. Hail testified that deaths were occurring due to fentanyl: "[M]ost of the people that are dying from fentanyl are using . . . a little tiny fraction of one pill." She also stated, "I spend a lot of time either treating fentanyl overdoses in a health care setting or having to look at a lot of dead bodies in the legal cases that I review."

Jimenez maintains, however, that there must have been a substantial risk of death and that the State failed to prove that the risk was substantial because it presented no evidence about the number of people who had died from fentanyl overdosing. *See Warren v. State*, No. 02-17-00221-CR, 2018 WL 3764069, at *4 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication) ("The phrase 'clearly dangerous to human life' is not defined by the penal code, but the test is whether the act objectively created a substantial risk of death."); *Compton v. State*, No. 2-06-281-CR, 2007 WL 4462575, at *6 (Tex. App.—Fort Worth Dec. 20, 2007, no pet.) (per curiam) (mem. op., not designated for publication) ("An act clearly dangerous to human life is one that creates a substantial risk of death."); *Depauw v. State*, 658 S.W.2d 628, 634 (Tex. App.—Amarillo 1983, pet. ref'd) ("Appellant is

18

correct in his assertion that an act clearly dangerous to human life is one that creates a substantial risk of death.").

We agree that the State had to prove a substantial risk of death. *See Warren*, 2018 WL 3764069, at *4; *Compton*, 2007 WL 4462575, at *6; *Depauw*, 658 S.W.2d at 634. However, we disagree that the State failed to meet that burden. Dr. Hail testified that even the tiniest fraction of a fentanyl pill could be lethal and that the pills might contain a thousand times more fentanyl than would ever be used in a healthcare setting. And this risk was not hypothetical; during his interview, Jimenez acknowledged that he was aware of at least one other person who had died from a fentanyl overdose, and Dr. Hail explained how lethal fentanyl was compared to other drugs. The State quantified the risk not in the number of people that fentanyl had killed but in the lethality of even the smallest dose of fentanyl. As Dr. Hail explained, once someone was opioid toxic, "if no one is around to help you, then there's a substantial risk of death."[16] *See Bigon v. State*, 252 S.W.3d 360, 366 (Tex. Crim. App. 2008) (holding that driving into the oncoming lane of travel several times before a collision resulted was an act clearly dangerous to human life that was in furtherance of the underlying felony DWI); *Driver v. State*, 358 S.W.3d 270, 276 (Tex. App.—

[16]Dr. Hail stated that doctors can effectively treat a fentanyl overdose with Narcan (naloxone). Because Narcan is now an over-the-counter nasal spray, Dr. Hail explained that if someone at the scene has Narcan, that person can administer it; if not, the person must call 911. In this context, Dr. Hail said that absent someone at the scene recognizing that the patient is opioid toxic, "then there's a substantial risk of death."

Houston [1st Dist.] 2011, pet. ref'd) (holding that defendant who handled cocaine in a manner so that his infant son could eat it constituted an act clearly dangerous to human life); *Loredo v. State*, 130 S.W.3d 275, 280 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding that the defendant committed an act clearly dangerous to human life when, while in the course of committing burglary, he was a party to lighting a fire that caused the deaths of two firefighters). As for the scope of the danger, Dr. Hail described fentanyl as an epidemic throughout the United States.

Viewing all of the evidence in the light most favorable to the verdict, a rational jury could have found that Jimenez's sale and delivery of fentanyl was an act clearly dangerous to human life. *See* Tex. Penal Code Ann. § 19.02(b)(3); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. We overrule Jimenez's first issue.

### 2. Jimenez caused Diaz's death.

The medical examiner testified that Diaz died from a fentanyl overdose. The State presented uncontroverted evidence that Diaz's only source of fentanyl was from the drugs that Jimenez had sold to Smith and that Smith had given to Diaz. But for Jimenez's selling the fentanyl to Smith, Diaz would not have overdosed on fentanyl. Smith's giving the fentanyl to Diaz and Smith's failure to recognize that Diaz was experiencing a fentanyl overdose were concurrent causes but did not break the causal link. *Cf. Williams*, 235 S.W.3d at 765 (holding that mother could not be held criminally responsible for letting her boyfriend babysit her children because she could not have foreseen her boyfriend's falling asleep, a fire starting, and the fire killing her

20

children—mother's acts were "not a 'but-for' cause of the result"); *see Cyr*, 665 S.W.3d at 560 (stating that the mother in *Williams* "could not have foreseen the series of . . . events [that] led to a . . . fire killing her children because there was no evidence suggesting [her boyfriend] was 'an incompetent caretaker,' [but in this case,] an avalanche of evidence pointed to [a]ppellant's knowledge of [her boyfriend's] ongoing abuse of [her child]"); *see generally McCuller v. State*, No. 06-22-00153-CR, 2023 WL 8270633, at *1–8 (Tex. App.—Texarkana Nov. 30, 2023, no pet.) (mem. op., not designated for publication) (holding that sufficient evidence supported jury's verdict that appellant had caused victim's death notwithstanding the fact that after appellant had drugged her and struck her in the head with a hammer, the victim had managed to drive away, after which the victim drove on the wrong side of the highway, parked her car, got out of her car, and walked onto the highway, where she was struck and killed by an on-coming vehicle not "exceeding the sixty miles per hour speed limit");[17] *Daniel v. State*, 478 S.W.3d 773, 778 (Tex. App.—Fort Worth 2015, no pet.) (holding that the deceased's death was a result of the appellant's conduct because the car accident that killed the deceased would not have occurred but for appellant's racing with a second driver, whose vehicle—not appellant's—struck the deceased's car). When "two or more causes satisfy 'but for' causation, a criminal defendant remains liable if her conduct was either sufficient to have caused the result alone 'regardless of

---

[17]The State argued that "had [the appellant] not acted in the manner he did, [the deceased] would be alive today." *McCuller*, 2023 WL 8270633, at *4.

the existence of a concurrent cause,' or both causes '*together*' were sufficient to cause the result." *Cyr*, 665 S.W.3d at 557 (quoting *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986)).

Jimenez's ignorance of the person who ultimately consumed the drugs similarly does not break the causal link: "A person is . . . criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that: (1) a different offense was committed; or (2) a different person . . . was injured, harmed, or otherwise affected." Tex. Penal Code Ann. § 6.04(b)(1), (2). Under the Texas Penal Code, the scope of causation is broad. *Cyr*, 665 S.W.3d at 557.

Jimenez was aware that selling fentanyl could kill someone. A rational juror could have reasonably found beyond a reasonable doubt that the only difference in the risk that Jimenez took—killing Smith by selling fentanyl to her—was the person whom he killed—Diaz. *See* Tex. Penal Code Ann. § 6.04(b)(2); *see generally Bell v. State*, 169 S.W.3d 384, 396 (Tex. App.—Fort Worth 2005, pet. ref'd) ("Under [Section 6.04(b)], a defendant can be 'criminally responsible' for the death of another if he actually caused the victim's death while acting with the intent to kill a different person, even if he did not intend to kill the actual victim."); *Castillo v. State*, S.W.3d 812, 818 (Tex. App.—Amarillo 2002, pet. ref'd) ("[A] rational jury could have reasonably inferred that appellant intended to shoot and kill [one person] in retaliation for the

earlier happenings, saw him in the car, fired, and instead killed [a different person]. Thus, appellant's conviction for murder is supported by legally sufficient evidence.").

Under the Texas Penal Code, a rational juror could have reasonably concluded that beyond a reasonable doubt, Jimenez caused Diaz's death. *See* Tex. Penal Code Ann. § 6.04(a), (b)(2). We overrule Jimenez's second issue.

## IV. CONCLUSION

Having overruled both of Jimenez's issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 16, 2025